UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>AMY SMART,<br><br>Defendant. | CASE NO. 2:24-cr-144<br><br>JUDGE JAMES L. GRAHAM<br><br>**DEFENDANT'S SENTENCING MEMORANDUM** |

**NOW COMES DEFENDANT AMY SMART**, by and through undersigned counsel, pursuant to the Sentencing Reform Act of 1984; *United States v. Booker*, 543 U.S. 220 (2005); and 18 U.S.C. § 3553(a), and respectfully submits this Sentencing Memorandum in support of the recommended probationary sentence. (Plea Agreement, ECF No. 3 at ¶ 10) ("The parties agree to recommend a term of probation, the length and conditions to be determined by the Court").

**I.  INTRODUCTION**

Amy pleaded guilty to Count One, 18 U.S.C. § 1035(a)(1) (False Statements Relating to Health Care Matters), which carries a statutory maximum term of imprisonment of five years. In Amy's plea agreement, she also agreed to (1) pay restitution in the amount of $345,093 to the Ohio Medicaid Program and (2) enter into a voluntary consent Order with the Centers for Medicare and Medicaid (CMS) and the Ohio Department of Medicaid to be permanently excluded from participating in any federal or Ohio health care benefit program. (ECF No. 3 at ¶¶ 10-11).

This Court is tasked with the decision to accept or reject the recommended probationary sentence. *See* Fed. R. Crim. P. 11(c)(3)(A). Under the factors set forth in 18 U.S.C. §3553(a), this Court should accept the recommended sentence, as a sentence to probation with whatever conditions the Court deems appropriate will adequately serve the purposes of sentencing.

II.     **UNRESOLVED OBJECTIONS TO THE PRESENTENCE REPORT**

The defense objects to the Probation Department's recommendation of a $10,000.00 fine in this case. A fine was not agreed to by the parties in the extensive negotiations which led to the plea agreement resolving this case. Such a fine would be counterproductive to the goals of sentencing because a) it is more than necessary to achieve adequate deterrence and punishment in this case, and b) would detract from the ability of the defendant to repay the full amount of $345,093.00 in restitution agreed to in the plea agreement. The United States concurs that a fine should not be imposed in this case.

III.    **ARGUMENT**

Congress instructs federal courts to sentence each individual defendant in a manner that is "sufficient, but not greater than necessary" to accomplish the rehabilitative and retributive goals of the criminal justice system. 18 U.S.C. § 3553(a). After all, "[t]he belief no longer prevails that every offense in a like legal category calls for an identical punishment without regard to the past life and habits of a particular offender." *Williams v. New York*, 337 U.S. 241, 247-48 (1949). ("Retribution is no longer the dominant objective of the criminal law. Reformation and rehabilitation of offenders have become important goals of criminal jurisprudence"). In the instant matter, Amy's acceptance of responsibility and her determination to pay restitution support the defense and government's joint recommendation for a non-incarceration, probationary sentence.

Fed. R. Crim. P. 11(c)(1)(C) permits the government and a defendant to reach a plea agreement where the parties agree that a specific sentence is the appropriate disposition of the case. The district court may then accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report. Rule 11(c)(3)(A). Once the court accepts the plea agreement, the recommendations included therein bind the court. Rule 11(c)(1)(C). Though the United States

2

Sentencing Guidelines are advisory, the district court still must consider the United States Sentencing Guidelines in its assessment of the plea agreement, and it must determine that "'(1) the agreed sentence is within the applicable guideline range; or (2)(A) the agreed sentence is outside the applicable guideline range for justifiable reasons; and (B) those reasons are set forth with specificity.'" *Hughes v. United States*, 584 U.S. 675, 682 (2018) (citing United States Sentencing Commission Guidelines Manual § 6B1.2(c) (Nov. 2016) (USSG)).

"[O]ne thing is clear" when a district court endeavors to assess a plea agreement: it "must 'rationally construct a decision' based on 'all relevant factors.'" *United States v. Cota-Luna*, 891 F.3d 639, 647 (6th Cir. 2018) (citing *United States v. Moore*, 916 F.2d 1131, 1136 (6th Cir. 1990)). As such, the district court must apply the sentencing factors in 18 U.S.C. § 3553(a) and consider, as relevant here: (1) "the history and characteristics of the defendant," (2) "the nature and circumstances of the offense," (3) the need to "provide just punishment," (4) the need to offer "adequate deterrence" (5) the need "to protect the public," and (6) "the need to avoid unwarranted sentencing disparities[.]" Here, each of these factors supports a non-incarceration sentence.

### A. *Amy's personal history supports the recommended probationary sentence.*

Amy has worked tirelessly to overcome several trials in her life and become the hardworking and service-driven member of the community she is today. Her early life tracks the difficulties that ultimately led her to her past wrongdoings and colors the errors underlying this case.

To begin with the most significant element of her personal history: In early 2002, Amy received a prescription pill from a friend to help her sleep. (Presentence Investigation Rep. ("PSR"), ECF No. 19 at ¶ 50). This single event changed her life, and she quickly developed an addiction to prescription pills that would drive her actions for the following years. (*Id*.). The onset

3

of Amy's addiction was not sudden, as it resulted from the unimaginable stress she was under at the time, as well as the lasting effects of abuse she suffered at the hands of her loved ones. During her childhood, Amy's father displayed anger issues and inflicted both physical and emotional abuse on her due to his own financial stress. (*Id*. at ¶ 45). After Amy started a family of her own, she once again suffered both emotional and physical abuse at the hands of Lee Morningstar, her second husband. (*Id*. at ¶ 49). This abuse and the chaos it wreaked in their home eventually drove Amy's younger son to move in with his father and Amy's first husband, Brad Postle, though Amy was the primary caregiver for her three children for years up to this point. (*Id*. at ¶¶ 48-49).

By 2002, Amy was the sole caregiver for two of her children. (*Id*. at ¶ 50). She began a relationship with Emmanuel Smart, who would become her third husband, but he spent the majority of their marriage overseas on deployment with the armed forces. (*Id*.). The stress of Amy's concern for Mr. Smart's safety, on top of the already extraordinary stress of raising her children alone, led Amy to depend on and abuse prescription pills. In an all too familiar story, to fund her addiction, Amy resorted to crime: she stole funds from her employers. She was ultimately convicted for her crimes in 2006 and, as a result of her conviction and probation violations, she served five years in state prison. (*Id*. at ¶ 51). As part of her incarceration, Amy was admitted to the Ohio Department of Rehabilitation and Correction for substance abuse and mental health treatment. (*Id*.). Stated plainly, the treatment she received while incarcerated saved her life—Amy has not used any illicit drugs since August 28, 2006. (*Id*. at ¶ 64).

Though this low point in Amy's addiction was the end result of several traumatic events in her life, she has never shied away from the damage that she caused during this period of dependence. In fact, she has often shared her story with others struggling with the same disease. In her recovery, Amy discovered that her purpose was to provide the same life-saving treatment

4

in her community. She obtained her substance abuse counseling license in Ohio in 2013 and began to work as a counselor. (*Id*. at ¶¶ 52, 69). Amy began working at Riverside Recovery Services in 2015, eventually becoming an owner of the business in 2017, where she remained until the onset of this matter. (*Id*. at ¶¶ 52, 71). In that position, Amy demonstrated a formidable work ethic and dedication to the community. She strived to hire those who overcame similar struggles with addiction, and she often stepped in to keep the operations of the company running when Riverside struggled with staffing issues.

Amy's work ethic never faltered—not even when she was diagnosed with breast cancer in 2017. (*Id*. at ¶ 58). At this time, Amy underwent a lumpectomy of her left breast and chemotherapy treatments. (*Id*.). She has been in remission since 2019. (*Id*.). Thus, even in the face of significant personal turmoil, Amy built the company and fought to keep the lights on for eight difficult years. And, though she is deeply ashamed of the conduct that has resulted in her conviction, her experience serves to manifest a woman who has overcome significant obstacles in her life and has spent the better part of the last decade devoted to helping others.

Amy completely accepts responsibility for the offense for which she has pleaded guilty in this case and is in no way trying to minimize that fraudulent statements were submitted to Ohio Medicaid under her ownership of Riverside Recovery Services. However, it is necessary to point out that the offense in this case occurred simultaneously to incredible efforts to help the community and to bring counselling, treatment, relief, and oftentimes, recovery, to the lives of hundreds of residents of Central Ohio. Although Amy's time at Riverside Recovery Services ended with the resolution of this case, it should not be lost upon the Court that this case does not tell the entirety of the story of Riverside Recovery Services, which also consisted of years of providing compassionate and life-saving critical services to individuals struggling with addiction including

housing, food assistance, clothing, and medical needs. As the testimonials submitted with this memorandum make clear, Amy ran an organization that helped change—and even save—dozens of lives. (*See* **Exhibit A – Letters of Support**). These efforts, as well as the fact that Amy has demonstrated that she can rise above previous mistakes in her life to make positive and lasting contributions to society, are every bit as worthy of the Court's consideration in this case as is the offense conduct.

In an effort to demonstrate her remorse for the offense committed in this case and fully comply with the plea agreement, Amy sold her ownership interest in her company, allowed her counseling license to expire, and agreed to voluntarily enter into a voluntary consent Order with the Centers for Medicare and Medicaid (CMS) and the Ohio Department of Medicaid to be permanently excluded from participating in any federal or Ohio health care benefit program. (ECF No. 3 at ¶ 10). Amy's efforts at recompense go beyond mere compliance with the plea agreement, though. She is determined to continue to contribute to society and earn sufficient funds to pay her restitution in full. Amy promptly sought a new position in a new field and recently began employment as a marketing administrative specialist for Illuminate USA, a solar panel manufacturing company in Pataskala, Ohio. In her free time, Amy is also working to open her own bakery. (PSR at ¶ 70). The sentence fashioned between the parties in this case will allow Amy to continue her work to make amends for her misdeeds, and to fulfill the restitution agreement.

Finally, during this trying chapter of her life, Amy is supported by her fiancé, Kristopher Kidwell. (*Id*. at ¶¶ 54-56). Amy is additionally supported by her three, now grown, children: Flint Postle, Logan Postle, and Josie Postle, and spends as much time as is possible with her seven grandchildren. (*Id*. at ¶ 48). One of Amy's greatest regrets was the effect that her time in state prison had on her children. She strived to rebuild her relationship with them upon her recovery

from her addiction and now in the newest chapter of her life with her grandchildren. Amy also remains close to her four siblings: Julie Queen, Mark Dudgeon, John Dudgeon, and Rose Hartschuh. (*Id*. at ¶ 47). As such, after much work on her part during the last twelve years, Amy developed an extensive and strong network of support and accountability. Her efforts, yet again, speak to her readiness and willingness to comply with any terms of her probation.

In sum, Amy's personal history and characteristics, including her moving recovery journey, her service to the community, and especially her efforts to reform her life in the wake of her prior mistakes, militate against any sentence to incarceration. The government agreed to as much in its recommendation of a probationary sentence. (ECF No. 3 at ¶ 10). This agreement, which accounts for whatever conditions the Court deems appropriate and the prompt payment of restitution and an appropriate fine, is sufficient but not greater than necessary to meet the goals of federal sentencing.

> **B.** ***The nature and circumstances of the offense in this case do not require a term of incarceration.***

The offense resulted from Any's tireless efforts to keep her business open and to ensure continued services to both its clients and employees. At some point, she gave way to the pressure and instructed employees of the business to submit enhanced and untruthful claims for heightened reimbursements. (*Id*. at ¶ 17). To that end, Amy's offenses were financial crimes that affected a single victim: Ohio Medicaid. (*Id*. at ¶ 18). Amy's offense was non-violent and did not cause direct harm to any person. However, Amy recognizes that her actions cost the government time and resources, and she takes full responsibility.

Amy has consistently demonstrated her remorse and willingness to make amends for her conduct by fully cooperating with the government's investigation. Not only has she pleaded guilty in this case to take responsibility for her actions, but she also recognizes the importance of paying

7

the restitution calculated by the government to make Ohio Medicaid whole. Restitution, in this case, is a significant factor—though Amy is financially stable, she did not use the reimbursement payments to fund an extravagant lifestyle. Indeed, Amy owns a modest vehicle, and she shares a one-bedroom cottage with her fiancé. (*Id*. at ¶ 53).

Ultimately, there is no question that Amy seriously erred in decisions she made while running Riverside Recovery Services. However, the conduct at issue here is aberrant when compared to the growth and strength of character that Amy has consistently demonstrated during the course of her recovery. Her conduct, which was motivated, in part, to keep her company in business and to support her staff, is among the biggest regrets of her life. The nature and the circumstances of Amy's conduct, including the lack of individual victims and her tireless efforts to make amends, provide significant support for the recommended non-incarceration sentence.

> C. *A sentence agreed to by the parties provides adequate punishment and deterrence, and Amy presents no danger to the public.*

Here, the conviction itself and the recommended sentence certainly restrict Amy's liberty and impose adequate punishment to serve both specific and general deterrence. The statute that Amy pleaded guilty to violating does not require the Court to impose a term of imprisonment. 18 U.S.C. § 1035(a)(1) (authorizing a sentence of "not more than 5 years," but establishing no minimum sentence). Thus, Congress "not only envisioned, but accepted, the possibility that some defendants found guilty" under this statute "would receive no jail time at all." *United States v. Husein*, 478 F.3d 318, 332 (6th Cir. 2007). Indeed, it has been consistently recognized that a probationary sentence, while more lenient than a term of incarceration, still results in a substantial restriction of liberty. *See Gall v. United States*, 552 U.S. 38, 48 (2007) ("We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially

8

restrict their liberty."); *United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled.") (internal citation omitted).

This Court would not be alone in instituting the recommended non-incarceration sentence under the unique circumstances in Amy's case. A below-guidelines sentence would be consistent with the nationwide sentencing data from 2023, which tracked approximately 80% of health care fraud sentences below the guidelines range. (United States Sentencing Commission, *Quick Facts: Health Care Fraud*, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Health_Care_Fraud_FY23.pdf (last accessed Mar. 17, 2025).

More than the governmental custody involved in the proposed sentence, Amy's felony conviction also carries permanent exclusion from participating in any federal or Ohio health care benefit program. (ECF No. 3 at ¶ 10). This condition in itself effectively ends Amy's career in the health care field—the field in which she built a career for nearly a decade. This element of Amy's sentence, in addition to the damage to her reputation in her community, carries significant weight to deter Amy from further misconduct. In fact, the terms agreed to in this sentence ensure that she can never again make the same mistake.

Amy submits that such measures are sufficient to deter any health care professional from taking the same course of conduct. The mere threat of a felony conviction and loss of livelihood are a strong general deterrent to white collar crime, rather than the length of the subsequent sentence. *See* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28–29 (2006) ("Imaginable increases in the severity of punishments do not yield significant (if any) marginal deterrent effects. Three National Academy of Sciences panels, all appointed by Republican presidents, reached that conclusion…"). Thus, the long-reaching consequences of

Amy's conviction have the greatest impact, and the recommended non-incarceration sentence is adequate to serve justice in this matter.

Further, the recommended sentence is more than sufficient to ensure the safety of the public. As noted above, Amy's offense was non-violent, and she poses no physical threat to others. And this conviction ensures that she cannot repeat her actions in the health care field. Amy understands the necessity for these measures, and she has shifted her work ethic to begin to move past her prior actions. The public will be best protected by allowing Amy to continue to have gainful employment, to contribute to society, and make her restitution payments.

### D. *The recommended sentence here trends with similar offenders and creates no concern of sentencing disparities.*

The probationary sentence agreed to by the parties in this case—accompanied by an agreed restitution order in the amount of $345,093 to the Ohio Medicaid Program and Amy's agreement to voluntarily enter into a consent order with the Centers for Medicare and Medicaid and Ohio Department of Medicaid to be permanently excluded from participating in any federal or Ohio health care benefit program—a would be sufficient but not greater than necessary sentence to comply with the purposes of 18 U.S.C. § 3553. (ECF No. 3 at ¶¶ 10-11). As such, a court shall consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). It is important to note that Courts throughout this district have frequently sentenced defendants similarly situated to Amy to sentences substantially the same as the parties have agreed to in this case.[1]

---

[1] Below is a sampling of cases in the United States District Court for the Southern District of Ohio in which similar sentences were delivered:

*United States v. Farah*, Case No. 2:24-CR-00100, in which Chief Judge Sarah D. Morrison sentenced the defendant to three years' of probation, restitution of $37,000.00, and a forfeiture of $265,000.00 for a conviction of Conspiracy to Commit Bank Fraud.

As this case and the other cases noted in Footnote 1 demonstrate, the sentence the parties have agreed to in order to resolve this case is well within the heartland of the types of sentences that have been imposed for similar offenses in this district.

## CONCLUSION

For all of the reasons set-out above, the defense requests that the Court accept the plea agreement negotiated to resolve this case and sentence Amy to the terms agreed to by the parties: a period of probation, accompanied by an agreed restitution order in the amount of $345,093.00 to the Ohio Medicaid Program, and order Amy to voluntarily enter into a consent order with the Centers for Medicare and Medicaid and Ohio Department of Medicaid to be permanently excluded from participating in any federal or Ohio health care benefit program.

Respectfully submitted,

*/s/ Michael J. Hunter*
Michael J. Hunter (OH: 0076815)
**Flannery | Georgalis, LLC**
175 S. 3rd St., Suite 1060
Columbus, OH 43215
(614) 324-4139
mhunter@flannerygeorgalis.com

---

*United States v. Diane, et al.*, Case No. 2:23-CR-00037, in which Judge Michael H. Watson sentenced defendants to probation, restitution, and for one defendant, one-day imprisonment, for the convictions of Conspiracy to Commit Wire Fraud related to fraudulent COVID-19 relief applications.

*United States v. McMahan, et al.*, Case No. 2:22-CR-00196, in which Judge Michael H. Watson sentenced a defendant to one-day imprisonment, three years of supervised release, and restitution for a conviction of Wire Fraud.

*United States v. Koher, et al.*, Case No: 3:18-CR-00073, in which Judge Thomas M. Rose sentenced a defendant to probation and restitution for a conviction of SNAP Fraud.

*United States v. Joyce, et al.*, Case No. 2:17-CR-00138, in which Judge James L. Graham sentenced a defendant to 24-months of probation, a fine, and restitution for a conviction of Conspiracy to Commit Wire Fraud.

*United States v. Musgrave, et al.*, Case No. 3:11-CR-00183, in which Judge Timothy S. Black sentenced a defendant to one-day imprisonment, supervised release, a fine, and restitution for the convictions of Conspiracy to Commit Wire and Bank fraud, Wire Fraud, Bank Fraud, and Conspiracy to Make False Statements to a Financial Institution.

*United States v. Coman*, Case No. 2:12-CR-00031, in which Judge Peter C. Economus sentenced the defendant to probation and restitution for a conviction of Money Laundering.

Paul M. Flannery (OH: 0091480)
**Flannery | Georgalis, LLC**
1375 E. 9th St., 30th Floor
Cleveland, OH 44114
(216) 466-0162
paul@flannerygeorgalis.com

*Attorneys for Defendant Amy Smart*

12

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 17, 2025, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the represented parties by operation of the Court's electronic filing system.

*/s/ Michael J. Hunter*
Michael J. Hunter (OH: 0076815)